UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

R. ALEXANDER ACOSTA,
Secretary of Labor,
United States Department of Labor,

*Plaintiff*,

v.

KDE EQUINE, LLC d/b/a Asmussen Racing Stables, and STEVE ASMUSSEN, Individually and as President,

*Defendants.*

Complaint

Civil Action No. 19-cv-3389

1.     Plaintiff, R. Alexander Acosta, Secretary of Labor, United States Department of Labor (the "Secretary"), by and through undersigned counsel, brings this action pursuant to Section 16(c) and Section 17 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201, *et seq*.) ("the Act" or "the FLSA"), alleging that Defendants violated Sections 7, 11(c), 15(a)(2), and 15(a)(5) of the Act; to recover back wages and liquidated damages; to enjoin acts and practices that violate the provisions of the FLSA; and to obtain other appropriate relief.

2.     The Secretary brings this action seeking back wages, liquidated damages, and other relief for the employees who care for and assist in training thoroughbred horses at Defendants' stables in Elmont, New York, and assist in racing the horses in Saratoga Springs and Queens, New York. Since at least 2016, Defendants have underpaid more than one hundred such employees, known as groomers and hot walkers, in New York. These employees are crucial to Defendants' prize-winning operations; their duties include warming horses up ahead of races and workouts, cooling the horses down afterwards, and cleaning the horses, stables, and equipment.

1

3.     Since January 2013, Defendants have been enjoined by this Court to comply fully with the FLSA. Despite affirmatively recognizing and agreeing to comply with the FLSA as part of their resolution of previous overtime and recordkeeping violations, Defendants continue to willfully withhold from employees hundreds of thousands of dollars in wages owed for long hours caring for Defendants' prize-winning horses. Though employees' weekly work hours vary based on the race horses' schedules and training needs, Defendants have wrongfully paid flat salaries that deprive employees of all required overtime pay. And although Defendants sometimes pay employees extra for additional assignments, the extra pay is not based on employees' actual hours worked and does not include all overtime premiums owed under the Act. In furtherance of their willful scheme, Defendants have directed employees to sign incomplete or false timesheets and maintained other inaccurate records of employees' hours.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to Section 17 of the FLSA, 29 U.S.C. § 217, and 28 U.S.C. §§ 1331 and 1345.

5.     Venue of this action lies in the United States District Court for the Eastern District of New York because a substantial part of the events or omissions giving rise to the claims occurred in this District, specifically in Nassau and Queens Counties.

## FACTUAL ALLEGATIONS

### THE PARTIES

*Plaintiff*

6.     Plaintiff R. ALEXANDER ACOSTA is vested with authority to file suit to restrain violations of the FLSA and recover back wages and liquidated damages, and is the proper plaintiff for this action.

*Defendants*

7.      Defendants KDE EQUINE, LLC d/b/a Asmussen Racing Stables ("KDE") and ASMUSSEN together employ groomers, hot walkers, assistant trainers, and forepersons at thoroughbred horse training stables and racetracks in Elmont, Saratoga Springs, and Queens, New York (among other locations outside New York).

Corporate Defendant KDE

8.      Defendant KDE is an LLC organized under the laws of the State of Texas, with a registered office at 3216 Shadow Drive West, Arlington, Texas 76005.

9.      KDE operates a year-round thoroughbred horse training stable at Belmont Park Race Track ("Belmont"), located at 2150 Hempstead Turnpike, Elmont, New York 11003.

10.     In addition to Belmont, Defendants attend races elsewhere in New York at Saratoga Race Course and Aqueduct Racetrack; train horses year-round at stables in Texas and Kentucky; and attend races in other states, including Louisiana and New Jersey.

Individual Defendant Asmussen

11.     Defendant ASMUSSEN, an individual, is a founder, President, and managing member of KDE.

12.     Asmussen also serves as KDE's head trainer.

13.     Defendants employ assistant trainers to manage each of KDE's stables, including the Belmont stables.

14.     Asmussen hires KDE's assistant trainers.

15.     Asmussen sets KDE's assistant trainers' rates of pay.

16.     Asmussen actively oversees KDE's day-to-day operations nationwide.

17.     As part of his personal involvement in KDE's business, Asmussen regularly speaks with the assistant trainers at each of KDE's stables (including the Belmont stables) to discuss the details of the stable operations, horses' performance, training schedules, diet, exercise, and the tasks to be performed by KDE's groomers and hot walkers.

18.     Asmussen determines the training schedule for horses at KDE's Belmont operation.

19.     Asmussen regularly travels to each of KDE's stables, including to Belmont.

20.     Asmussen attends races at Saratoga Springs and Aqueduct to observe the performance of horses cared for by KDE's groomers and hot walkers.

21.     When at Belmont, Asmussen discusses the training and care of horses with KDE's assistant trainers and forepersons, including tasks to be performed by KDE's groomers and hot walkers.

22.     In consultation with KDE's assistant trainers and forepersons, Asmussen directs how long particular horses should be walked by hot walkers after races, depending on the training needs of individual horses.

23.     Asmussen directly supervises KDE's assistant trainers and forepersons.

24.     Under Asmussen's oversight, KDE's assistant trainers and forepersons directly supervise KDE's groomers and hot walkers.

25.     Asmussen points out employee performance issues to Belmont's assistant trainer (at all times relevant to this complaint, Toby Sheets) with the expectation that Sheets will pass on the feedback directly to the employee.

26.     Along with other KDE administrative personnel, Asmussen sets hot walkers' and groomers' rates of pay.

27.     Defendant Asmussen is an employer of KDE's employees within the meaning of Section 3(d) of the Act, 29 U.S.C. § 203(d).

**DEFENDANTS ARE AN ENTERPRISE ENGAGED IN COMMERCE**

28.     Defendant KDE is an enterprise within the meaning of Section 3(r) of the Act, 29 U.S.C. § 203(r).

29.     In addition to New York, Defendants train thoroughbred stables in Texas and Kentucky and race horses in yet other states.

30.     At all times relevant to this Complaint, KDE has had an annual gross volume of sales made or business done in an amount not less than $500,000.

31.     Defendants employ the hot walkers and groomers listed in Exhibit A, as well as other employees, in the activities of an enterprise engaged in commerce or in the production of goods for commerce, including the handling of, selling of, or otherwise working on goods or materials that have been moved in or produced for commerce. These goods include but are not limited to horse feed, horse bedding, harnesses, saddles, stirrups, reins, bits, brushes, liniments, poultices, and horse blankets.

32.     Defendants' employees have been employed in an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s)(1)(A) of the Act, 29 U.S.C. § 203(s)(1)(A).

33.     KDE is an employer of its groomers and hot walkers within the meaning of Section 3(d) of the Act, 29 U.S.C. § 203(d).

### DEFENDANTS' PROHIBITED PAY PRACTICES

*Defendants Fail to Pay Premium Pay for All Overtime Hours Worked*

34.     From at least June 3, 2016 through the present, Defendants failed to pay overtime premiums to hot walkers and groomers who worked more than 40 hours in a given week, as required by the Act. Their violations stem from at least three interrelated practices. First, Defendants knowingly undercount employees' actual hours worked, concealing from payroll and time records many of the hours spent performing assigned tasks. Second, rather than paying employees based on their actual hours worked, Defendants have paid a combination of fixed salaries and lump sums based on factors such as the number of horses cared for, or number of additional tasks assigned. Accordingly, in workweeks for which employees worked overtime, Defendants have failed to properly calculate and pay employees the required overtime premiums. Third, Defendants have denied their H-2B visa employees the proper additional overtime wages owed to those employees at the rates required by the Act and the H-2B non-immigrant visa program.

Defendants Underestimate Employees' Hours and Falsify Time
Records to Conceal Actual Hours Worked, Denying Premium Pay for All Hours Worked

35.     As a result of the training schedules and assignments, Defendants require their hot walkers and groomer employees at Belmont, Aqueduct, and Saratoga to work schedules that vary from day to day and week to week. However, Defendants do not properly take these fluctuating hours into account when calculating the wages owed to their employees.

36.     Defendants' employees employed as hot walkers are primarily responsible for walking and exercising horses, including warming them up ahead of races or other workouts, and cooling them down afterwards.

37.     Defendants' hot walkers also have some responsibilities for cleaning stable areas and the horses themselves, bringing water to the horses, doing laundry, and holding horses while being attended by a blacksmith.

38.     Defendants' employees employed as groomers perform duties that include brushing horses, clipping their hair, cleaning the stables and equipment, taking the horses to designated locations at the track on race days and returning the horses to the stables after races, putting on and removing saddles and bridles, administering liniments and poultices, and holding horses that are receiving veterinary care.

39.     Defendants' hot walkers and groomers in New York regularly work for Defendants in excess of 40 hours per week.

40.     Defendants do not accurately track employee work time and or start and stop times each day.

41.     In a typical non-race week, Defendants generally assign hot walkers and groomers to work a base number of hours each week.

42.     For hot walkers, the base assigned schedule is typically a minimum of roughly 46.5 hours per week. Hot walkers work these hours over a seven-day workweek.

43.     The base assigned schedule for groomers is typically a minimum of 60 hours or more per week. Groomers work these hours over a seven-day workweek.

44.     In addition to these base schedules, hot walkers and groomers work substantial additional hours for Defendants, such as for the extra time associated with bringing horses to and from races on race days, traveling between racetracks (such as between Belmont and Aqueduct or Saratoga), and performing tasks such as laundry or attending to horses during veterinary or blacksmith visits.

45.     On race days, Defendants' employees typically work three hours or more on top of their base schedules. For example, groomers and hot walkers who otherwise work about 90 minutes in the afternoon on non-race days regularly work about four hours in the afternoon on race days, in addition to their regularly scheduled morning shifts.

46.     Defendants create falsified timesheets that consistently underreport the number of hours worked by hot walkers and groomers each week, and incorrectly report the start and stop times.

47.     In many weeks, Defendants create timesheets with inaccurate hours, never presenting them to groomers and hot walkers for review or signature.

48.     In other weeks, Defendants require groomers and hot walkers to sign blank or incomplete time sheets.

49.     After employees sign the time sheets, Defendants' supervisors subsequently record daily and weekly hours that do not include all of employees' actual hours worked.

50.     For example, for the workweek ending July 6, 2016, one of Defendants' timesheets shows that a hot walker supposedly only worked afternoon hours on two days, July 1 and July 4, 2016. However, that hot walker also worked for Defendants at a Belmont race during the afternoon of July 2, 2016 — time nowhere accounted for in the weekly timesheet.

51.     In many weeks, Defendants disregard the timesheet hours entirely and simply pay employees for far fewer hours as Defendants see fit.

52.     Defendants regularly failed to record approximately 6 to 12 or more hours of work per week for many groomers and hot walkers.

53.     At all times relevant to this Complaint, Defendants regularly denied their employees premium pay owed pursuant to the Act for all hours worked over 40 per week.

54.    For example, for the workweek ending September 5, 2018, one of Defendants' timesheets shows that a groomer worked for 64.5 hours. However, according to Defendants' payroll for the same week, Defendants computed the groomer's pay based on only 53.5 hours of work, denying him at least $148.50 in overtime premiums owed under the Act.

### Defendants Have Failed to Calculate Employees' Regular Rates and Premium Pay As Required Under the Act

55.    At times relevant to the complaint, Defendants have also paid some hot walkers and groomers the same salary week after week, without regard to actual hours worked, even though these employees worked more than 40 hours each of those weeks.

56.    At times relevant to the complaint, Defendants have determined salaries for employees based on the number of horses typically in each employee's care, rather than the actual hours worked.

57.    For example, a typical weekly salary paid to hot walkers for caring for 4 horses in 2016 was $360 and in 2018, $462.

58.    A typical weekly salary paid to groomers for caring for 4 horses in 2016 was $576 and in 2018, $662.75.

59.    In addition to the base salaries, at times relevant to the complaint, Defendants have paid their employees additional lump sums for performing other assigned tasks, such as laundry or unloading hay, or accompanying horses to races.

60.    For example, Defendants often paid employees an additional $25 or so for working on a race day, without calculating the actual overtime premium owed to each employee for the additional hours as required by the Act.

61.    For example, during the 2016, 2017, and 2018 racing seasons, Defendants regularly assigned a hot walker to work race days for three or more hours of work in race weeks, in addition

9

to the base schedule of about 46.5 hours. For these additional hours in 2018, Defendants only paid the employee a lump sum of $28.88 in addition to the base salary, far less than the overtime premium required for the additional hours.

62. During such race weeks, Defendants paid this employee at a regular rate of roughly $9.92 per hour, well below the applicable New York state minimum wage of $11 per hour.

63. At all times relevant to this Complaint, when employees worked in excess of 40 hours in a given workweek and were paid lump sums for extra tasks, Defendants did not include all required compensation in calculating the overtime wages due, as required by the Act.

64. Nor did Defendants take account of all hours worked when calculating employees' overtime compensation due in such workweeks, as required by the Act.

### Defendants Failed to Pay H-2B Employees the Required Rate for Overtime Hours

65. During the relevant period, Defendants employed temporary nonimmigrant employees ("H-2B employees") as some of their groomers and hot walkers pursuant to the H-2B provisions of the Immigration and Nationality Act, as amended, including 8 U.S.C. § 1101(a)(15)(H)(ii)(b), § 1184(c)(14), and regulations at 20 C.F.R. Part 655, subpart A (2015), and 29 C.F.R. Part 503 (2015).

66. To obtain approval to hire H-2B employees, an employer must submit a Temporary Employment Certification (TEC), in which the employer certifies, under penalty of perjury, that the information contained on the TEC is true and accurate and that the employer will abide by the terms and conditions of the H-2B program.

67. In a TEC submitted for 2017, KDE certified that between April 1, 2017 and November 30, 2017, it would pay its H-2B employees in New York $12.67 per hour.

68.    In a TEC submitted for 2018, KDE certified that between April 1, 2018 and November 30, 2018, it would pay its H-2B employees in New York $13.29 per hour.

69.    In a TEC submitted for 2019, KDE certified that between April 1, 2019 and November 30, 2019, it will pay its H-2B employees in New York $13.05 per hour.

70.    During the periods covered by the TECs, the regular rate owed to Defendants' H-2B employees in New York during overtime workweeks pursuant to Section 7 and 29 C.F.R. § 778.5 could not fall below the rates listed on the respective TECs.

71.    Defendants' H-2B employees in New York regularly worked in excess of 40 hours in a week but Defendants did not pay premium pay based on the required regular rate for those hours.

72.    For example, according to Defendants' own records and not counting unrecorded hours worked, during the week ending May 25, 2018, Defendants paid an H-2B worker who worked 55 hours for overtime hours at only 1.5 times the New York minimum wage of $11, rather than at 1.5 times the required regular rate of $13.29. As a result, Defendants denied the H-2B employee at least $51.53 in premium pay for that week.

*Defendants Failed to Make and Maintain Accurate Records*

73.    Since at least June 7, 2016, Defendants failed to make, keep, and preserve adequate and accurate records of their employees and of the wages, hours, and other conditions of employment as prescribed by the regulations at 29 C.F.R. Part 516.

74.    More specifically, Defendants did not create or maintain adequate and accurate records of the dates and times that their employees started and stopped work each day.

75.    Moreover, Defendants did not create or maintain adequate and accurate records of the total regular and overtime hours that their employees worked each week.

76.     Instead, as described herein, Defendants created falsified time sheets that were incorrect on their face and underreported hours worked by employees.

77.     In addition, the hours Defendants recorded on their payroll frequently conflicted with the hours reported as the weekly totals on Defendants' falsified timesheets.

78.     As described herein, the hours reported in Defendants' payroll frequently conflicted with the hours recorded on Defendants' falsified time sheets and also understated the hours actually worked by groomers and hot walkers.

*Defendants' Violations of the Act Were Willful*

79.     Defendants have long known that their pay and recordkeeping practices violate the FLSA.

80.     In December 2012, Defendants entered into a Consent Judgment with the Secretary, filed in the U.S. District Court for the Eastern District of New York, Civil Action No. 12-cv-6368 (LDW/ARL) to resolve a prior FLSA case.

81.     The Consent Judgment has remained in effect since its approval by the late Judge Wexler on January 24, 2013.

82.     The Consent Judgment enjoins Defendants from violating Sections 6, 7, and 11(c) of the Act and the regulations found at 29 C.F.R. Part 516.

83.     Defendants have failed meaningfully to reform their pay and recordkeeping practices since entering into the Consent Judgment.

84.     As described herein, Defendants falsified their time records to underreport the actual hours worked and to avoid compliance with the Act's requirement that Defendants pay the required overtime premium for all hours worked beyond 40 in a week.

### FIRST CAUSE OF ACTION
### Violation of Sections 7(a) and 15(a)(2) of the FLSA
### Failure to Pay Overtime

85.     The Secretary incorporates by reference and re-alleges the allegations in paragraphs 1 to 84 of the complaint.

86.     Defendants willfully have violated the provisions of Sections 7 and 15(a)(2) of the Act by employing employees in an enterprise engaged in commerce or in the production of goods for commerce, for workweeks longer than forty hours, as prescribed in Section 7 of the Act, without compensating the employees for their employment in excess of the prescribed hours at rates not less than one and one-half times the regular rates at which they were employed.

87.     Therefore, Defendants are liable for unpaid overtime compensation and an equal amount in liquidated damages under Section 16(c) of the Act or, in the event liquidated damages are not awarded, unpaid overtime compensation and prejudgment interest under Section 17 of the Act.

### SECOND CAUSE OF ACTION
### Violation of Sections 11(c) and 15(a)(5) of the FLSA
### Failure to Make, Keep, and Preserve Adequate and Accurate Records

88.     The Secretary incorporates by reference and re-alleges the allegations in paragraphs 1 to 84 of the complaint.

89.     Defendants willfully have violated the provisions of Sections 11(c) and 15(a)(5) of the Act, in that Defendants failed to make, keep, and preserve adequate and accurate records of their employees and of the wages, hours, and other conditions of employment as prescribed by the Regulations at 29 C.F.R. Part 516.

**WHEREFORE**, cause having been shown, Plaintiff respectfully requests that this Court enter judgment against Defendants as follows:

1. An injunction issued pursuant to Section 17 of the Act permanently restraining Defendants, their officers, agents, servants, employees, and those persons in active concern or participation with Defendants, from violating the provisions of Sections 6, 7, 11(c), 15(a)(2), and 15(a)(5) of the Act;

2. An order pursuant to Section 16(c) of the Act finding Defendants liable for unpaid overtime compensation found due Defendants' employees listed on the attached Exhibit A and an equal amount of liquidated damages (additional back wage compensation and liquidated damages may be owed to certain employees presently unknown to Plaintiff for the period covered by this Complaint); or

3. In the event liquidated damages are not awarded, for an injunction issued pursuant to Section 17 of the Act restraining Defendants, their officers, agents, employees, and those persons in active concert or participation with Defendants, from withholding the amount of unpaid overtime compensation found due Defendants' employees, and prejudgment interest computed at the underpayment rate established by the Secretary of Treasury pursuant to 26 U.S.C. § 6621;

4. An order finding that Defendants have failed to comply with the permanent injunction entered on January 24, 2013 in *Solis v. KDE Equine LLC et ano.*, No. 12-cv-6368 (LDW/ARL) (E.D.N.Y.);

5. An order compelling Defendants to reimburse the Secretary for the costs of this action; and

6. An order granting such other relief as the Court may deem necessary or appropriate.

DATED:     June 7, 2019
           New York, New York

                                  KATE S. O'SCANNLAIN
                                  Solicitor of Labor

                                  JEFFREY S. ROGOFF

Regional Solicitor

BY:     /s/ Jason E. Glick
        JASON E. GLICK
        Trial Attorney

        /s/ David J. Rutenberg
        DAVID J. RUTENBERG
        Trial Attorney

        U.S. Department of Labor,
        *Attorneys for Plaintiff Secretary of Labor*

        U.S. Department of Labor
        Office of the Regional Solicitor
        201 Varick Street, Room 983
        New York, NY 10014
        (646) 264-3650
        (646) 264-3660 (fax)
        glick.jason.e@dol.gov
        rutenberg.david.j@dol.gov
        ny-sol-ecf@dol.gov

**Acosta v. KDE Equine, LLC, et ano., 19-cv-3389**
**Complaint  - Exhibit A**

Employees

1.      Abreu, Joshua
2.      Acevedo, Joel
3.      Aguilar, Juana
4.      Alajara, Felix
5.      Almante, Francisco
6.      Andrade, Fernando
7.      Aragon, Bertario
8.      Armenta, Jose
9.      Ayala, Felix
10.     Ayala, Steven
11.     Bacerra, Anna
12.     Barrera, Francisco
13.     Barrios, David
14.     Bencosme, Sammy
15.     Berrera, Francisco
16.     Bonilla, Juan Antonio
17.     Bowman, Christopher
18.     Brown Jr., Dale
19.     Buitrago, Christian
20.     Cabezudo, Emanuel
21.     Cadazos, Jose
22.     Cakalovic, Esteban
23.     Calderon, Pedro
24.     Caldron, Ceaser
25.     Cardenas, Eneida
26.     Carmona, Jose
27.     Carpintero, Catalina
28.     Carpintero, Gabriela "Torres"
29.     Carpintero, Marcella
30.     Casso, Mirium
31.     Castillo, Jose
32.     Castro, Hector
33.     Colon, Luis
34.     Concepcion, Wilmer
35.     Cuesta, Francisco Almante
36.     Delgado, Juan

16

37.     Donis, Adelmo
38.     Fragoso, Melquiades
39.     Franco, Jose
40.     Franco, Xenia
41.     Frisco, Diane
42.     Garcia, Adrian Rodriguez
43.     Garcia, Braulio
44.     Garcia, Eustaquio
45.     Garcia, Juan
46.     Garcia, Misael
47.     Gibson, Danny
48.     Gonzalez, Kevin
49.     Gorostieta Roman, Javier
50.     Hernandez, Bonita Rocha
51.     Hernandez, Edgar
52.     Hernandez, Fernando
53.     Hernandez, Jose
54.     Hernandez, Mario
55.     Herra, Miguel
56.     Herrera, Efrain
57.     Jacuinde, Ricardo
58.     Jimenez, Ignacio
59.     Juarez, Hernan
60.     King, Edward
61.     Latham, Daniel
62.     Lema, Luz
63.     Lizana, Aderlen
64.     Lopez, Carlos Uribe
65.     Lopez, Heriberto
66.     Lopez, Mauricio Maya
67.     Mahir, Bridgit
68.     Marana, Francisco
69.     Mendez, Homero
70.     Morales, Gerardo
71.     Morales, Veronica
72.     Moreno, Diego Omar
73.     Moreno, Francisco
74.     Moreno, Javier
75.     Moreno, Juan Jesus
76.     Nolasco, Juan Manuel

77.   Ortiz, Xavier
78.   Oseguera, Daniel
79.   Osorio, Gilberto
80.   Paltero, Mirna
81.   Pantoja, Alberto
82.   Pantoja, Diego Armando
83.   Pastariza, Wilmer
84.   Peres, Dolmer
85.   Perez, Patricia
86.   Perez, Siomara
87.   Platero, Mirna
88.   Quiroz, Francisco
89.   Ramirez, Jesus
90.   Ramirez, Jose Guadalupe
91.   Ramirez, Luis Alberto
92.   Ramirez, Mario
93.   Ramirez, Michael
94.   Rivera, Javier
95.   Rivera, Maria
96.   Rocha, Veronica
97.   Sanchez, Nicolas
98.   Spears, Whitney
99.   Tepalcingo, Hermenegildo
100.  Tlalmanalco, Sixto
101.  Tofolarea, Jose Dolores
102.  Topey, George
103.  Torres, Jesus
104.  Torrez, Gabriela
105.  Trejo, Brian Omar
106.  Vancini, Sarahy
107.  Vasquez, Diana
108.  Vasquez, Maria
109.  Vasquez, Mauricio
110.  Vazquez, Diana
111.  Vega, Pedro Bonilla
112.  Viera, Omar